```
     C5m6gopc
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    GOPAL BURGHER and SCOTT JAFFE,
4                   Defendants,
5              v.                          12 CV 4042(JKG)(WHP)
6    B. SETH BRYANT,
7                   Defendant.
8    ------------------------------x
                                           New York, N.Y.
9                                          May 22, 2012
                                           5:00 p.m.
10
     Before:
11
                        HON. JOHN G. KOELTL,
12
                                           District Judge
13
                              APPEARANCES
14
     JOSHUA FINGOLD, ESQ.
15   TERESA ROSEN PEACOCKE, ESQ.
          Attorneys for Plaintiffs
16
     PILLSBURY WINTHROP SHAW & PITTMAN, LLP.
17        Attorneys for Defendant
     BY:  TIMOTHY M. RUSSO
18
19
20
21
22
23
24
25
```

1              (Case called; in open court)

2              THE DEPUTY CLERK:  All parties please state who they
3    are for the record, starting with counsel who is appearing by
4    telephone.

5              MR. RUSSO:  Good afternoon.  This is Tim Russo for
6    defendant with Pillsbury Winthrop Shaw Pittman, LLP.

7              MR. FINGOLD:  Joshua Fingold.  I am counsel for the
8    plaintiffs, Scott Jaffe and Gopal Burgher.

9              MS. PEACOCKE:  Teresa Peacocke, counsel for the
10   plaintiffs.  Mr. Gopal Burgher and Mr. Scott Jaffe.

11             THE COURT:  Mr. Russo, could you please not be typing
12   because that comes through on the telephone.

13             MR. RUSSO:  I apologize, your Honor.  I was raising
14   the volume.  I was having a hard time hearing people speaking.

15             THE COURT:  We'll try to keep our voice up.  If you
16   don't hear us at any time, just tell us to raise our voices.

17             MR. RUSSO:  Understood.

18             THE COURT:  I have an order to show cause with a
19   temporary restraining order so I will listen to the plaintiff.
20   It is plain that I am hearing this as the Part I judge.  I will
21   in any event set it down I expect Judge Pauley before whom the
22   case is pending.  The real issues are whether there should be a
23   temporary restraining order and what an appropriate time to set
24   the matter down before Judge Pauley is.

25             So plaintiffs.

1          MR. FINGOLD:  Yes, your Honor.  On behalf of the
2     plaintiff we would respectfully ask you to grant the temporary
3     restraining order.  Your Honor, this is a classic freeze-out of
4     a partnership.  My two clients combined to own 56 percent of
5     the interest.  The defendant owns approximately 40 percent of
6     the interest and what he has done is taken a unilateral action
7     without proper authorization in violation of the partnership
8     agreement and without a proper quorum to lock one of my clients
9     out of the office and turn off his e-mails as a result of which
10    my client cannot work on the matters of the firm.  The other
11    client he has removed from the executive committee and from the
12    bank account and on information and belief he is draining that
13    account to pay for his own defense in this matter.
14         We would respectfully ask you to return the parties to
15    the status quo before this improper unilateral action and in
16    doing so we can prevent further harm and we have substantial
17    likelihood of success on the merits so it would be appropriate.
18         THE COURT:  You are going to have to give me more
19    information than that.  In your papers you indicate that you
20    want the matter returned to the status quo prior to
21    February 27, 2002.
22         MR. FINGOLD:  2012, Judge.
23         THE COURT:  I am sorry.  2012.
24         MR. FINGOLD:  Yes, Judge.  In February 2012 the
25    defendant in this case took a unilateral action of creating a

1   written consent, which we call it Bryant document since he was
2   the judge, jury, prosecution, accuser and executioner and
3   decided to change the partnership agreement such that Mr. Jaffe
4   is no longer a partner and Mr. Burgher is no longer on the
5   executive committee.  He sat on that document for four months,
6   took no action with it and then in the last several days he
7   locked the doors and Mr. Jaffe has not been able to get into
8   the office to work on his client matters.  The clients have
9   been calling the firm to ask for the matters to be transferred
10  to Mr. Jaffe because they are time-sensitive.
11          All the people here are professionals.  They are all
12  attorneys.  The defendant sat on this for months while he knew
13  it was a disputed matter and rather than take it to a court as
14  he should have, he just in the dead of night locked the doors.
15  As a result of this action, the clients of my client are being
16  harmed, and we would ask you to put it back in a position so
17  that he can continue to work on their matters and that there
18  will be no harm to them.
19          Additionally, my client's reputation is being
20  destroyed because the defendant is sending out notices to
21  anyone who sends an e-mail to him that he basically has been
22  fired from the firm.  As a result of this, it would cause no
23  harm to the defendant to undue this and bring it back to how it
24  was two weeks ago, but it causes impossible and irreparable
25  harm every single minute that this current situation goes on,

1    your Honor.
2            THE COURT:  I don't understand.  You say that the
3    unilateral action was taken on February 27th, 2012 but the
4    defendant sat on it?
5            MR. FINGOLD:  Yes, your Honor.  The defendant wrote up
6    a so-called written consent whereby he decided as the only
7    voting partner of significance that Mr. Jaffe no longer
8    deserves to be a partner in this firm and Mr. Burgher no longer
9    deserves to be on the executive committee.  That was contested.
10   The plaintiffs had been going back and forth about how to do
11   that and see if they could negotiate a settlement and the
12   defendant stonewalled them.  Nothing happened.  He made various
13   indications at different times that he was going to bring the
14   matter to various forums and again nothing happened.  And then
15   last week my clients attempted to get into the building and at
16   one point they were both denied.  Eventually Mr. Burgher was
17   allowed back in, but Mr. Jaffe still cannot access his e-mails.
18   He still does not have the resources of the firm.  He does not
19   have his client files.  The clients, he works on several
20   corporate matters with time-sensitive documents.  He receives
21   stock certificates for trust funds and hedge funds and they
22   need to be acted on.  It is causing irreparable harm by my
23   client not having access to the building, to the e-mail, by not
24   being on the web page, his reputation is being destroyed.  This
25   e-mail response that the defendant has set up is making people

1    think that he has been fired when in fact he is a partner of
2    the firm.  It is one of the exhibits to both affidavits in
3    support of our application.
4              With reference to Mr. Burgher, the bank account is
5    being used to pay for defense counsel and we would respectfully
6    ask your Honor this could be easily prevented just for a few
7    days until we have the opportunity to come before the assigned
8    justice and make an application for preliminary injunction,
9    which would be on full written papers with proper notice to
10   both parties.
11             THE COURT:  Mr. Russo.
12             MR. RUSSO:  Thank you, your Honor.  I just want to
13   start by saying this a case with a claim of one million dollars
14   of money damages only.  It is also by plaintiffs' own admission
15   a case that concerns a partnership agreement, which is subject
16   to arbitration.  So defense party moved to federal court and
17   then probably filed a motion to compel arbitration in the
18   matter.
19             THE COURT:  Hold on.  Hold on.  You have got to take a
20   break every now and then because otherwise I can't interpose a
21   question just in which the way the phone system works.
22             MR. RUSSO:  I apologize, your Honor.
23             THE COURT:  That's okay.  You mentioned being removed
24   to federal court.  The case is brought in federal court I
25   thought.  That is where we are.  Am I right?

C5m6gopc

1        MR. FINGOLD:  No, Judge.  It was brought in state
2   court and removed to federal court, your Honor.
3        THE COURT:  So, Mr. Russo, you removed it?
4        MR. RUSSO:  Yes, your Honor.  We removed it this
5   afternoon with hopes that we could probably move to compel
6   arbitration.  In our experience in state court TROs and
7   preliminary injunctions usually take longer to get decided as
8   well as motions and we thought it most appropriate to move to
9   federal court with the hope that we can get an more expeditious
10  decision allowing arbitration to proceed under the partnership
11  agreement.
12       THE COURT:  What is the basis for federal
13  jurisdiction?
14       MR. RUSSO:  Diversity, your Honor.  The defendant is a
15  New Jersey resident and both plaintiffs are New York residents.
16  One I understand is from Suffolk County on Long Island and the
17  other is a resident of New York County.
18       THE COURT:  It is citizenship, not residence.  But is
19  it right that Mr. Bryant is a citizen of New Jersey and that
20  both --
21       MR. RUSSO:  Yes.
22       THE COURT:  -- both plaintiffs are citizens of New
23  York?
24       MR. RUSSO:  Yes, it is, your Honor.
25       THE COURT:  That does not appear to be contested.

1           Next question.  Let me just ask the plaintiffs is it
2    right that the only release sought in the complaint is damages?
3           MR. FINGOLD:  That is not correct, your Honor.  We are
4    also asking for injunctive relief of restoration of both
5    partners to their full partnership interest and also to both
6    partners being on the executive committee where they were prior
7    to the unilateral action in the Bryant document.
8           Additionally, your Honor, we are asking for the Court
9    to declare that any unilateral actions taken by Mr. Bryant
10   while my partners have been frozen out to be null and void.
11          THE COURT:  Mr. Russo, included with the papers is a
12   complaint with a caption for the Southern District of New York.
13   Was the case begun in state court with a summons without a
14   complaint?
15          MR. FINGOLD:  Do you want me to answer, Judge?
16          THE COURT:  Yes.
17          MR. FINGOLD:  Yes, Judge.  The complaint was begun in
18   Manhattan Supreme Court with papers indicating a caption of
19   Manhattan Supreme Court.  When we got the removal notice, we
20   came to the ex parte office here and asked for assistance and
21   they told us we had to redo the papers with a Southern District
22   caption.  We ran to Kinko's and in effect made that change.
23          THE COURT:  Mr. Russo, even if you're right that the
24   matter should proceed in arbitration -- by the way, let me ask
25   the plaintiffs, there is an arbitration clause in the

1    partnership agreement?

2            MR. FINGOLD:  There is an arbitration clause.
3    However, we dispute that it applies to these types of
4    situations.  The arbitration clause applies to the amounts of
5    the accounting at the end of the partnership.  And also I would
6    note, your Honor, that the defendant in this case took actions
7    and if he thought there was an arbitration clause, he himself
8    should have submitted his disputed actions to arbitration.  He
9    sat on it for four months and then locked the doors in the
10   middle of the night one day and now he is trying to hide behind
11   an arbitration clause and we would respectfully ask you to
12   apply these provisional remedies even if the arbitration clause
13   were to be valid.

14           THE COURT:  Mr. Russo, go ahead.

15           MR. RUSSO:  Yes, your Honor.  The resolution clause in
16   the partnership agreement is very broad.  It says that it
17   applies in any controversy, claim or dispute between the
18   parties arising or relating to this agreement, referring to the
19   partnership agreement of course.  There is a provision
20   regarding resolving problems with the executive committee.  The
21   next step is actually to bring arbitration, which plaintiffs
22   have not done in this case.  Plaintiffs haven't served a
23   complaint on my client for the record.

24           What they are asking for here would harm an ongoing
25   business.  As you noted, this has been going on since February.

1   Emergency relief is not appropriate now after many months have
2   passed.  Access to partnership bank accounts or anything else,
3   a partnership which they are no longer a part of would be
4   inappropriate and would cause harm to the partnership as a
5   whole, not only my client who happens to be a managing partner
6   but the business entity that they have an issue with.  So for
7   that reason alone we think the TRO they are requesting would be
8   completely inappropriate at this time.
9               THE COURT:  Oh, I need more than rhetoric on both
10  sides frankly.  You can get provisional relief in court pending
11  arbitration.  So the fact that there is an arbitration clause
12  is not dispositive whether there should be provisional relief.
13              It is troubling that the parties have been talking
14  about this or that the plaintiffs had knowledge of this since
15  February, February 27th.  On the other hand, it is troubling
16  that the plaintiffs come in and say that the defendant has now
17  escaladed matters within the last couple of days blocking one
18  of the plaintiffs out of the office and making public
19  statements that the plaintiffs are no longer associated with
20  the firm.  That's an escalation.  Whether it's enough to get a
21  temporary restraining order is a question.  It doesn't advance
22  the ball a lot for the defendant to say that there will be lots
23  of people irreparable harmed if the TRO is granted without any
24  meat on those bones.  I don't accept the conclusory statements
25  by either side.  Let me ask a couple other questions and then

1   you can speak to these issues more.

2            One question that comes up, Mr. Russo, is what is it

3   that has occurred recently that would cause the escalation of

4   locking one of the partners, former partners you would say, out

5   and announcing to the world that the person is no longer a

6   partner and why is it that the parties could not reach some

7   form of standstill agreement between them until the judge could

8   hear a preliminary injunction as to whether in fact there

9   should be an injunction pending the outcome of the arbitration

10  or not?

11           There would seem to be a couple easily resolvable

12  issues such as the use of the bank account.  Also, there is the

13  issue of if the defendant was prepared to live with the two

14  plaintiffs since February, three months, what is it that would

15  cause the defendant not to be able to live with the plaintiffs

16  for another two weeks until the preliminary injunction could be

17  heard?

18           Mr. Russo, the ball is in your court.

19           MR. RUSSO:  Thank you, your Honor.  To be perfectly

20  frank, I don't have all of the facts in this case as we just

21  received this complaint last night.

22           THE COURT:  Okay.  You had told me that your client

23  had not been served with the complaint but you have had the

24  complaint overnight.  You really should have told me earlier

25  that you had the complaint overnight before telling me that

1    your client hasn't been formerly served, but go ahead.

2            MR. RUSSO:  Your Honor, I didn't intend to be

3    misleading in any way.  I was simply saying that there has been

4    no service in the case.  We received this last night as a

5    threat that it was going be filed today or overnight and we

6    received copies of it via county filing in New York State court

7    this morning.  I don't have the facts about what recently

8    transpired that caused things to change from his perspective.

9    So I would like to answer your Honor's questions at this time,

10   but I am simply unable to at this time.

11           THE COURT:  What is the nature of the firm that we're

12   dealing with, investment banking of some sort?

13           MR. FINGOLD:  Law firm, your Honor.

14           THE COURT:  Law firm.

15           MR. FINGOLD:  Your Honor, I would also note that I

16   personally spoke to the defendant on Friday night and offered

17   to meet him to give him copies of papers.  He refused to meet

18   me.  I e-mailed him the papers and I also e-mailed them to

19   Mr. Crichlow of Mr. Russo's firm on Friday evening.  We waited

20   for contact to see if they would be in response to us.  They

21   didn't.  I e-mailed him another set of papers last night, the

22   ones that had actually been filed with Manhattan Supreme Court.

23   And then we saw the defendant down at the courthouse this

24   morning and in just literally moments before we were going to

25   appear before a judgment of the Manhattan Supreme Court, we got

C5m6gopc

1   the removal papers to District Court.  The defense has known
2   about in for several days.  They have known about this for
3   several months and they just locked the doors last week.
4           THE COURT:  When last week?
5           MR. FINGOLD:  I believe it was May 8th, Judge.
6           THE COURT:  By my calendar that is not last week.
7           MR. FINGOLD:  I apologize, Judge.
8           THE COURT:  That's 14 days.  That's two weeks.
9           MS. PEACOCKE:  Just to clarify, your Honor, that this
10  precipitous action on the 8th of May, we sought so resolve it.
11  It was resolved in favor of Mr. Burgher, but not in favor of
12  Mr. Jaffe.
13          MR. FINGOLD:  It is still not completely in favor of
14  Mr. Burgher because Mr. Burgher cannot see the money being
15  drained from the bank account to pay for the defense counsel
16  who is on the phone right now.
17          THE COURT:  Draining the money from the bank account
18  for a law firm is not the kind of irreparable injury that you
19  would normally think about that would justify a temporary
20  restraining order.  If the money comes out and it shouldn't
21  come out, it can go back in.
22          MR. FINGOLD:  Yes, Judge.
23          THE COURT:  That is classically not a basis for a TRO.
24  Counsel for the defendant should be cautious about receiving
25  funds that may be determined shouldn't be paid.

C5m6gopc

1              Right, Mr. Russo?

2              MR. RUSSO:  Yes, your Honor.  We are so new to this
3    case as far as I am aware that I don't think we have actually
4    invoiced the firm to date.  So any allegation that the firm is
5    draining funds of the partnership at issue here, I don't think
6    there is a basis for that.  I can understand the concern by a
7    party.  I am an associate so I don't send bills for my firm,
8    but that is something that hasn't happened to date.

9              THE COURT:  You are very good and responsive.  Is
10   there a partner working on the case?

11             MR. RUSSO:  There is, your Honor.  Mr. Crichlow whom I
12   referred earlier is flying to Houston right now.

13             THE COURT:  Well, that is not a real response.  I am
14   sure it is a truthful response; it is just not a sufficient
15   response.  If you had enough information about the case to file
16   the removal papers, we would have hoped that you had enough
17   information to respond to the motion.

18             MR. RUSSO:  Your Honor, I apologize that I don't have
19   more information at this time.  We obviously did not anticipate
20   we would be responding to a motion in federal court on the same
21   day of the removal.

22             THE COURT:  Here is what I will do:  I will hear all
23   of you tomorrow at 2:30 and that will give time for the
24   defendant to gather the information to respond.  We're just
25   talking about the TRO really.  I am not going to issue the TRO

1    now, but I will listen to any arguments that the parties have
2    in favor of or in opposition to the TRO tomorrow at 2:30 p.m.
3    and the defendant should submit something in writing if the
4    defendant opposes the TRO by tomorrow at noon.
5         Mr. Russo, you should be in contact with Mr. Crichlow
6    and if Mr. Crichlow wants to appear tomorrow at 2:30 p.m. by
7    phone, that would be fine.  If he wants another one of his
8    partners to be here at 2:30 p.m., that is fine.  If you are
9    going to carry the ball completely, that's fine by me.  I am
10   not requiring this but anything else the parties want to submit
11   to me in support of or in opposition to the TRO should be
12   submitted to me by noon tomorrow.  And second, the parties
13   should ask themselves overnight -- I mean you are all lawyers.
14   The clients are lawyers -- whether some form of living
15   arrangement can be worked out between now and the time when
16   Judge Pauley can hear you on the preliminary injunction.
17        I appreciate in dealing with a law firm there are
18   issues including ongoing clients and are those clients of the
19   individual lawyers or are they clients of the firm, what is the
20   basis for the alleged dissolution of the partnership or the
21   ousting of an individual partner or partners.  So papers
22   tomorrow by noon.  I expect the parties to have discussed this
23   and to have discussed whether a living arrangement can be
24   worked out between now and the time of the hearing on the
25   preliminary injunction, which I expect will be early June,

C5m6gopc

1  probably Monday, June the 4th.  I will hear all of you tomorrow
2  at 2:30 p.m.
3              Yes.
4              MS. PEACOCKE:  Your Honor, just so ask in case the
5  parties are able to work out some sort of living arrangements,
6  can we communicate that to you other than by an appearance?
7              THE COURT:  Yes.  You can send me a fax at
8  212-805-7912.
9              MS. PEACOCKE:  Thank you very much.
10             MR. FINGOLD:  Also, your Honor, the I papers
11 themselves, do you want it them delivered to you via ECF or
12 hard copy to chambers.
13             THE COURT:  Hard copies to chambers is best.  You can
14 put them on ECF so you can communicate with everyone else that
15 way.  Hard copy to my chambers.  Courtesy copy is best.  And
16 you can try if the papers are not too long to try to fax them
17 to me.
18             Anything else?
19             MR. RUSSO:  Nothing from me, your Honor.  Thank you.
20             MR. FINGOLD:  Nothing, your Honor, from the
21 plaintiffs.
22             MS. PEACOCKE:  Your Honor, thank you.
23             THE COURT:  Good to talk to you all.  Good evening
24 all.
25                              o0o